# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| **VOXPATH NETWORKS, INC.,** | **Civil Action No: 4:08-cv-00127-RAS** |
| **Plaintiff,** | **JURY** |
| **v.** | |
| **VERIZON COMMUNICATIONS, INC. et al.** | |
| **Defendants.** | |
| **and Related Counterclaims.** | |

## PLAINTIFF VOXPATH NETWORKS, INC.'S
## OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

PAGE

I.   INTRODUCTION..........................................................................................................1

II.  FACTUAL BACKGROUND........................................................................................2

   A. VoxPath................................................................................................................2

   B. Background Technology – IP Addresses, The Internet And Private Networks...................2

   C. Problems With Prior Art VoIP Systems. ...............................................................4

   D. The VoIP Invention Of The '646 Patent...............................................................4

   E. The Agreed Construction Of Certain Terms..........................................................7

III. THE LAW OF CLAIM CONSTRUCTION. ................................................................8

   A. Claims Must Be Construed According To The Intrinsic Evidence.......................8

   B. Claim Terms Are Given Their Ordinary And Customary Meaning Except Where
      The Patentee Clearly And Unmistakably Intended A Different Meaning.........................8

   C. Limitations From the Specification Must Not Be Imported Into the Claims. ...................10

IV. VOXPATH'S PROPOSED CONSTRUCTIONS ARE BASED UPON PROPER
    CLAIM CONSTRUCTION PRINCIPLES AND SHOULD BE ADOPTED. ......................11

   A. "Media Gateway Controller" Means:  "The Programmed Hardware That Centrally
      Performs Registration, Call Setup, And Media Gateway Selections, And
      Public/Private IP Address Comparison And Selection."...................................................11

      1. The Claims, Specification and File History Support VoxPath's Proposed
         Construction. .......................................................................................................12

      2. Defendants' Construction Is Not Supported By The Intrinsic Evidence And
         Violates Federal Circuit Law Regarding Use of Statements in the Prosecution
         History.................................................................................................................13

         a.  The Media Gateway Controller Is Not Limited To "A Single Device."..................13

            i.   The Specification Discloses That The Media Gateway Controller Can Be
                 Multiple Devices............................................................................................13

            ii.  The File History Does Not Support Defendants' Construction. .........................13

         b.  Adding "Handles Interactions With Separate Gateways" To The
             Construction Of Media Gateway Controller Is Merely Improperly Importing
             A Limitation From An Embodiment And Is Vague.............................................16

         c.  Defendants' "Address Selection" Limitation Misquotes The File History,
             Has No Support In The Intrinsic Evidence And Is Vague And Confusing.............17

## TABLE OF CONTENTS

<u>PAGE</u>

B. "Registering a First Media Gateway with a Media Gateway Controller, Wherein Said Registering the First Media Gateway Comprises Receiving and Storing the Public IP Address of the First Media Gateway":  No Construction Necessary Or "Receiving And Storing The Public IP Address Of A Media Gateway." .........................18

   1. No Construction Is Necessary Because The Claim Defines The Term. .......................18

   2. Defendants' Construction Is Grammatically Flawed And Improperly Imports Limitations From The Specification. ...........................................................................19

C. "Source IP Address" Means:  "The Public Or Private IP Address Of The Media Gateway Sending The Call Setup Request To The Media Gateway Controller." .............21

D. "Memory Medium" Means:  "Memory." .......................................................................22

E. "The Media Gateway Controller Comparing A Public IP Address Of The First Media Gateway To A Public IP Address Of The Second Media Gateway":  No Construction Necessary. .................................................................................................23

V. CONCLUSION.............................................................................................................24

# TABLE OF AUTHORITIES

**PAGE**

### Cases

*Alcatel USA Sourcing, Inc. v. Microsoft Corp.*,
Case No. 6:06 CV 499, 2008 U.S. Dist. LEXIS 64351 (E.D. Tex. Aug. 21, 2008) ...............24

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003)...............................................................................................8

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002)...............................................................................................9

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004)...............................................................................................8

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999)...............................................................................................10

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)...............................................................................................11

*nCube Corp. v. SeaChange Int'l, Inc.*,
436 F.3d 1317 (Fed. Cir. 2006).............................................................................................10

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008).............................................................................................24

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)........................................................................................9, 16

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)......................................................................................passim

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
400 F.3d 901 (Fed. Cir. 2005)........................................................................................passim

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001).................................................................................10, 21, 23

*SanDisk Corp. v. Memorex Prods., Inc.*,
415 F.3d 1278 (Fed. Cir. 2005).........................................................................9, 14, 15, 20

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001).............................................................................................10

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002)..........................................................................9, 11, 14, 20

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)..........................................................................8, 9, 14, 20

## I.    INTRODUCTION.

Plaintiff VoxPath Networks, Inc. ("VoxPath") moves this Court for an order construing certain claim terms from the asserted claims[1] of U.S. Patent No. 7,068,646 (the "'646 patent").[2]

VoxPath is a small, Texas-based company that was formed to provide Voice over Internet Protocol ("VoIP") services to its customers.  VoxPath invested millions of dollars in the development of a suite of VoIP products.  While developing its products, VoxPath discovered that the then existing VoIP technology failed to address certain fundamental problems, for example how to efficiently connect VoIP calls when one or both of the IP telephones was on a particular kind of private network.  As a result, VoxPath conceived of and developed a number of solutions to overcome these fundamental problems, one of which is disclosed in the '646 patent.  Specifically, VoxPath's invention solved the problem of efficiently connecting a VoIP telephone call between two callers on the same private network.  Up until the invention of the '646 patent, prior VoIP systems failed to connect such a call or required that the call be connected in an inefficient and unsecured manner.  The invention taught in the '646 patent overcomes these problems.  VoxPath's solution proved to be visionary.  Many VoIP providers, such as the Defendants, now practice the invention taught and claimed by the '646 patent.

Through an extensive meet and confer process, the parties have agreed on constructions for the majority of terms proposed for construction by Defendants.  The construction of five claim terms remains in dispute.

VoxPath's proposed constructions for the disputed terms are based upon what one of ordinary skill in the art at the time of the invention would have understood the claims to mean based on the claims, the specification, and the file history (the so-called "intrinsic evidence").

In contrast, in an apparent effort to gerrymander a non-infringement argument, Defendants are attempting to use the claim construction process to improperly narrow the scope

---

[1] The presently asserted claims, as reflected in VoxPath's operative infringement contentions, are claims 1 through 18.

[2] Attached hereto as Exhibit A.  All exhibits referenced herein are attached to the Declaration of Andrew Weiss in support of this Opening Brief.

of the invention.  Simply put, the intrinsic evidence does not support Defendants' proposed constructions.  In fact, Defendants' proposed constructions commit a number of "cardinal" claim construction sins, including importing limitations from embodiments and adding unsupported claim limitations solely for the purposes of non-infringement.  Such constructions violate Federal Circuit law.

Because VoxPath's proposed constructions adhere to the Federal Circuit opinions on claim construction law, VoxPath respectfully requests that the Court adopt VoxPath's proposed constructions for the disputed terms.

## II.    FACTUAL BACKGROUND.

### A.    VoxPath.

VoxPath is a small, Texas-based company that was founded in early 2000.  The company was formed with the mission to provide affordable telephone service to customers using the Internet (i.e., VoIP), rather than traditional telephone hardware.  With the increasing accessibility and affordability of Internet access, VoIP was becoming a practical, if not preferred, option for businesses looking to obtain or upgrade phone service.   VoxPath has been awarded three patents for its VoIP related inventions and has one patent application pending.

### B.    Background Technology – IP Addresses, The Internet And Private Networks.

As will be more fully explained in VoxPath's Tutorial, every device connected to the Internet has an identifying number associated with it, called an Internet Protocol addresses ("IP address").  An IP address allows other devices to direct communications to that particular device, requiring each device to have a unique IP address.  Unfortunately, there are a finite number of possible IP addresses.   IP addresses are composed of a maximum of 12 numbers (e.g., 165.198.100.203) and only have a certain number of possible combinations.  The ubiquitous nature of the Internet has made unique IP addresses an endangered resource.[3]

---

[3] Although there are over 4 trillion possible public IP addresses, it quickly became clear that the explosive growth of the Internet and computer usage in general would consume all of these 4 trillion IP addresses.  If this limit were to be reached, no new devices could be connected to the Internet without first disconnecting an existing device.

One method that has been developed to conserve public IP addresses is the use of a Network Address Translation ("NAT") gateway (or similar device) between the Internet and a private network.[4]  A NAT gateway is a piece of hardware that sits between a private network and the Internet that allows all devices on the private network to share a single public IP address.  In such a private network, the NAT gateway generally is the only device with a public IP address.  All other devices on the network generally are assigned private IP addresses.[5]

Devices on such a private network can communicate with each other using their private IP addresses.  The private IP addresses are not, however, usable by devices outside of the private network (e.g., devices on the Internet).  Instead, devices outside of the private network must use the public IP address of the NAT gateway to communicate with devices on the private network.  To the outside world, the IP address of a device on a private network is the public IP address of the NAT gateway.  A simplified representation of the relationship between IP phones in a private network using a NAT gateway and the Internet is included below.



---

[4] A private network is a network of computers that is separated from the general Internet.  Although most private networks use a NAT gateway, some do not.  If the private network does not use a NAT gateway, it will not serve the IP address rationing purpose but it will serve other purposes, such as security.

[5] A certain range of IP addresses has been set aside for use as private IP addresses.  These IP address ranges include, e.g., 10.x.x.x, 172.16.x.x through 172.31.x.x, and 192.168.x.x.  Private IP addresses are unique on a given private network, but may be (and often are) repeated on other private networks.  In other words, the same private IP address will appear on numerous private networks.

### C.    Problems With Prior Art VoIP Systems.

While NAT gateways are very useful for implementing private networks, they create problems for VoIP telephone calls. One problem caused by private networks is that they create inconsistencies for several VoIP protocols.[6] Ex. A at 1:55-63. An additional problem is the "triangle problem." *Id.* at 2:23-26. The triangle problem arises where both the caller and callee are on the same private network and, as viewed from the public Internet, have the same public IP address. *Id.* at 2:40-53. The prior art disclosed that calls in this situation would either be connected using the public IP addresses (thereby causing the packets to leave the private network only to come right back, wasting bandwidth and introducing potential security concerns inherent in the Internet) or would require the use of complex, sophisticated equipment that could identify these situations and redirect the data internally before it left the private network. *Id.* at 2:46-65. Neither method was efficient.

### D.    The VoIP Invention Of The '646 Patent.

The '646 patent includes three parallel independent claims: 1 (method), 7 (system) and 13 (memory medium). It teaches an invention that overcomes the problems of the prior art and ensures that VoIP calls where at least one telephone is on a private network are connected in an efficient and secured manner. One embodiment of the invention is shown in block format in Figure 3A of the '646 patent, reproduced below:



---

[6] Popular VoIP protocols that are relevant in this case include SIP (Session Initiation Protocol), MGCP (Media Gateway Control Protocol) and MEGACO (also known as H.248).

IP Phones 120A and 120B are telephones configured to work with a VoIP system. In the lexicon of the '646 patent, IP Phones are referred to as "Media Gateways."[7] *See* Ex. A at 6:25-26 ("an IP telephone is a Media Gateway"). The patented invention calls for centralized hardware and software to perform a series of steps to determine whether a given VoIP call is between two IP telephones (or Media Gateways) on the same network. If they are, the centralized hardware and software will route the call directly between the two IP telephones on the network, without sending the packets out to the general Internet. The centralized hardware and software is, in the language of the '646 patent, the "Media Gateway Controller."[8] The Media Gateway Controller, shown as MGC 150 above, will perform a number of functions, including registration, call setup, Media Gateway selections and IP address comparison and selection. Ex. C at VOX000078 (an excerpt from the file history of the '646 patent).

The first task required by the invention is that the Media Gateway must "register" with the Media Gateway Controller. Ex. A at 16:24-29. As stated in the claim itself, "registering . . . comprises receiving and storing the public IP address" of the Media Gateway. *Id.* at Claim 1.

When a caller is ready to make a call, the caller's Media Gateway transmits a call setup request to the Media Gateway Controller. *Id.* at 23:53-60; 30:53-56. In one embodiment described in the specification, the call setup request includes the source IP address and the destination telephone number. *Id.* at 30:54-56. The Media Gateway Controller will then process the call setup request by selecting the appropriate Media Gateways based on the information in the call setup request. *See id.* at 24:64-65; 30:57-67. For example, the Media Gateway Controller will use the data it collected during the registration process to select the caller's Media Gateway based on the source IP address. *Id.* at 30:57-61. The Media Gateway Controller will

---

[7] The parties agree that the proper construction of Media Gateway is: "Any telephony or communication device that operates to use a network protocol, such as Internet Protocol ('IP'). Said another way, a media gateway is a device that receives an analog signal and encodes the signal into an IP data stream, or vice versa. IP telephones and Trunking Gateways are examples of Media Gateways." Ex. B.

[8] "Media Gateway Controller" is one of the disputed terms.

also select the second Media Gateway based on the destination telephone number received in the call setup request. *Id.* at 30:62-67.

Once the appropriate Media Gateways are selected, the Media Gateway Controller compares the public IP addresses of the Media Gateways. If the public IP addresses are the same, the two Media Gateways are likely on a private network behind the same NAT gateway. *See id.* at 31:9-15. The Media Gateway Controller will therefore use the private IP addresses of the Media Gateways to complete the call setup. *Id.* If the public IP addresses are different, however, the Media Gateway Controller will use the public IP addresses to complete the call setup. *Id.* at 31:16-20.

Thus, by using the claimed invention, if the caller and callee are behind the same NAT gateway, they will be able to use private IP addresses to connect directly to each other, without having to traverse the NAT gateway. *See* Ex. A at 26:5-8. Otherwise, their Media Gateways will connect with each other using the public IP addresses of their Media Gateways. *See* Ex. A at 31:42-46.[9]

Claim 1 is representative of the claimed invention, and is set forth below with the disputed terms in bold:[10]

> 1.  A method for performing IP telephony, comprising:
>     **registering** a first Media Gateway with a **Media Gateway Controller**, wherein said registering the first Media Gateway comprises receiving and storing the public IP address of the first Media Gateway;
>     registering a second Media Gateway with the Media Gateway Controller, wherein said registering the second Media Gateway comprises receiving and storing the public IP address of the second Media Gateway;
>     the Media Gateway Controller receiving a Call Setup request, wherein the Call Setup request comprises a **source IP address** and a destination telephone number;

---

[9] Notably, though a direct connection over a private network is possible as a result of the invention, the invention does not require that phones directly communicate with each other. Nor does the invention require that all data between the phones be communicated using the IP addresses selected by the Media Gateway Controller.

[10] Four of the five disputed terms appear in claim 1. "Memory Medium" appears in Claims 13 through 18.

the Media Gateway Controller selecting the first Media Gateway
based on the source IP address;

the Media Gateway Controller selecting the second Media Gateway
based on the destination telephone number;

**the Media Gateway Controller comparing a public IP address
of the first Media Gateway to a public IP address of the
second Media Gateway**;

if the public IP address of the first Media Gateway is the same as
the public IP address of the second Media Gateway, the Media
Gateway Controller selecting a private IP address of the first
Media Gateway and a private IP address of the second Media
Gateway for Call Setup; and

if the public IP address of the first Media Gateway is not the same
as the public IP address of the second Media Gateway, the
Media Gateway Controller selecting the public IP address of the
first Media Gateway and the public IP address of the second
Media Gateway for Call Setup.

The patented invention is important to the efficient and secure operation of a VoIP system. It solves the problems presented in the prior art and ensures that VoIP calls made between Media Gateways on the same private network remain on that network, saving Internet bandwidth and protecting the call from the security risks inherent in the Internet.

E.    The Agreed Construction Of Certain Terms.

Since some of the disputed terms make reference to and relate to some of the agreed terms, those agreed constructions that are relevant to the disputed terms are set forth below:[11]

| Claim Terms or Phrase | Agreed Construction |
|---|---|
| Media Gateway | Any telephony or communication device that operates to use a network protocol, such as Internet Protocol ("IP"). Said another way, a media gateway is a device that receives an analog signal and encodes the signal into an IP data stream, or vice versa. IP telephones and Trunking Gateways are examples of Media Gateways. |
| public IP address | a unique Internet Protocol address assigned by any Regional Internet Registry. |
| private IP address | an IP address in the ranges described in the Internet Engineering Task Force's (IETF) Request for Comment (RFC) 1918, as well as any IP addresses that have not been assigned by any Regional Internet Registry |

_____

[11] The full set of jointly proposed constructions for the agreed terms is set forth in the Joint Claim Construction Chart, attached as Exhibit B.

III.    **THE LAW OF CLAIM CONSTRUCTION.**

    A.    **Claims Must Be Construed According To The Intrinsic Evidence.**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims themselves . . . to define the scope of the patented invention").  Thus, a disputed claim term must be considered in the context of the entire claim.  *Phillips*, 415 F.3d at 1314 ("To begin with, the context in which a term is used in the asserted claim can be highly instructive.").

"It is well settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e. the patent itself, including the claims, the specification, and, if in evidence, the prosecution history."  *Vitronics*, 90 F.3d at 1582.  "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.  In such circumstances, it is improper to rely on extrinsic evidence."  *Id.* at 1583.  If the Court does choose to rely on extrinsic evidence, the Court must be sure to consider the flaws inherent in such evidence while weighing its effect on the intrinsic evidence.  *Phillips*, 415 F.3d at 1318-19 (describing the flaws of relying on extrinsic evidence); *see also Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003)  ("Extrinsic evidence may never be relied upon, however, to vary or contradict the clear meaning of terms in the claims.").

Accordingly, the Court should rely on the intrinsic evidence to construe the disputed claim terms and can only rely on extrinsic evidence if the term cannot be construed using the intrinsic evidence alone.  To the extent that extrinsic evidence varies or changes the intrinsic evidence, it should be disregarded.

    B.    **Claim Terms Are Given Their Ordinary And Customary Meaning Except Where The Patentee Clearly And Unmistakably Intended A Different Meaning.**

Claim terms should be construed in accordance with their ordinary and customary meaning, as a person of ordinary skill in the art would understand them at the time of the

invention. *Phillips*, 415 F.3d at 1312-13 ("We have frequently stated that the words of a claim 'are generally given their ordinary and customary meaning.' We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." (quoting *Vitronics*, 90 F.3d at 1582) (internal citations removed)). Indeed, there is a "heavy presumption" that claim terms will be given their ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002), *cert. denied*, 123 S. Ct. 2230 (2003).

Although claim terms are generally construed according to their ordinary meaning, the law permits a patentee to specially change their meaning if, and only if, it is clear from the intrinsic record that the patentee intended to do so. *Vitronics*, 90 F.3d at 1582 ("Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002) ("[W]e conclude that claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). The disavowal of claim scope must be so clear and unambiguous that the public could rely on the representation. *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) ("An ambiguous disclaimer, however, does not advance the patent's notice feature or justify public reliance, and the court will not use it to limit a claim term's ordinary meaning. There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term." (internal citations removed)); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) ("Consequently, for prosecution disclaimer to attach, our precedent requires that

the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.").

Thus, absent a clear disclaimer of the scope of the claims, the disputed claim terms should be given their common, ordinary meanings.

## C.    Limitations From the Specification Must Not Be Imported Into the Claims.

In claim construction, the danger of reading limitations from the specific embodiments described in the specification must be avoided.  *Phillips*, 415 F.3d at 1319-1320 ("one of the cardinal sins of patent law [is] reading a limitation from the written description into the claims." (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)); *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) ("By its reliance on the figures, the district court improperly limited claim 1 to a preferred embodiment.  We have consistently advised against this approach to claim construction."); *nCube Corp. v. SeaChange Int'l, Inc.*, 436 F.3d 1317, 1321-22 (Fed. Cir. 2006) (affirming a judgment of willful infringement, the Federal Circuit recognized the claims intended a broader scope than the described embodiments and upheld the finding that a patent on a method and apparatus for multimedia data networking was not limited to the specification's mention of routing data messages using logical addresses); *see also Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ("General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone.").  "Claims of a patent may only be limited to a preferred embodiment by the express declaration of the patentee." *Playtex*, 400 F.3d at 908; *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344-45 (Fed. Cir. 2001) ("Our case law is clear that an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention.").  "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v.*

*Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex,* 299 F.3d at 1327) (reversing district court's holding that injector claims were limited to injectors with pressure jackets, even though every embodiment in the specification had pressure jackets).

Therefore, without an express indication to the contrary, limitations from the specification should not be imported into the claims.

## IV.   VOXPATH'S PROPOSED CONSTRUCTIONS ARE BASED UPON PROPER CLAIM CONSTRUCTION PRINCIPLES AND SHOULD BE ADOPTED.

Although the parties have been able to agree on the constructions of a number terms, the construction of five claim terms remains in dispute:  (1) "Media Gateway Controller"; (2) "registering a first Media Gateway with a Media Gateway Controller, wherein said registering the first Media Gateway comprises receiving and storing the public IP address of the first Media Gateway"; (3) "Source IP Address"; (4) "Memory Medium"; and (5) "the Media Gateway Controller comparing a public IP address of the first Media Gateway to a public IP address of the second Media Gateway."  The constructions proposed by VoxPath are based on the full scope of the intrinsic evidence and should therefore be adopted.  Defendants' proposed constructions should be rejected because the intrinsic record does not support them and they violate claim construction principles.

### A.   "Media Gateway Controller" Means:  "The Programmed Hardware That Centrally Performs Registration, Call Setup, And Media Gateway Selections, And Public/Private IP Address Comparison And Selection."

| Term | VoxPath's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Media Gateway Controller | the programmed hardware that centrally performs registration, call setup, and media gateway selections, and public/private IP address comparison and selection | a single device that centrally handles interactions with separate gateways to perform registration, Call Setup, media gateway selections, public/private IP address comparison, and address selection |

As discussed below, the bulk of VoxPath's construction is common to both proposed constructions and therefore not in dispute.  The primary difference between VoxPath's and

Defendants' constructions is that Defendants seek to add limitations not found in the intrinsic evidence for non-infringement purposes. Accordingly, VoxPath will only briefly touch on why VoxPath's construction (and the part common to Defendants' construction) is supported by the intrinsic evidence. VoxPath will then address each of the additional limitations introduced by Defendants and explain why Defendants' construction should be rejected.

1.    ***The Claims, Specification and File History Support VoxPath's Proposed Construction.***

The term "Media Gateway Controller"[12] means: "the programmed hardware that centrally performs registration, call setup, and media gateway selections, and public/private IP address comparison and selection." VoxPath's construction tracks "what the inventors actually [thought they] invented" (*Phillips*, 415 F.3d at 1316) as the inventors described to the USPTO in the claims, specification and file history of the '646 patent and is therefore fully supported by the intrinsic evidence. The Media Gateway Controller is hardware and software (i.e., programmed hardware) that is designed to perform a number of functions. *See, e.g.*, Ex. A at Claim 1; 3:53-64; 4:51-5:7; 5:12-15; 5:21-28; 12:24-48; 16:24-29; 17:52-62; 17:67-18:9; 22:25-40; 24:64-66. While described in detail in the '646 patent, the inventors aptly summed up the functionality of the Media Gateway Controller in the file history by stating that the Media Gateway Controller is operable to perform a number of functions, including "registration, Call Setup, Media Gateway selections, and public/private IP address comparison and selection." Ex. C at VOX000078 (December 2, 2005 Response to Office Action). Furthermore, as discussed in more detail below, the inventors also explained that the Media Gateway Controller in their invention must be centrally controlled by a single entity. Ex. C at VOX000078 ("Note that such centrally controlled functionality allows local control of these functions"). Thus, the construction proposed by VoxPath captures the full scope of the invention claimed by the inventors in the '646 patent.

---

[12] The term "Media Gateway Controller" is found in claims 1, 7, 10, 11 and 13.

> **2.**    ***Defendants' Construction Is Not Supported By The Intrinsic Evidence And Violates Federal Circuit Law Regarding Use of Statements in the Prosecution History.***

Defendants, on the other hand, argue that Media Gateway Controller should be construed as:  "**a single device** that centrally **handles interactions with separate gateways to** perform registration, Call Setup, media gateway selections, public/private IP address comparison**, and address** selection."   This proposed construction is clearly directed at the Defendants' non-infringement argument and is not appropriate for claim construction.   The three areas of disagreement, which are shown in bold, are discussed in detail below.

> **a.**    **The Media Gateway Controller Is Not Limited To "A Single Device."**

Defendants improperly attempt to limit the construction of Media Gateway Controller to a single device instead of programmed hardware.

> **i.**    ***The Specification Discloses That The Media Gateway Controller Can Be Multiple Devices.***

The '646 patent itself does not limit the Media Gateway Controller to a single device.  In fact, the specification discloses just the opposite.   For example, the specification describes an embodiment where the Media Gateway Controller is a portion of a "soft switch", which the patent explicitly describes as "a group of systems running many applications to perform a variety of functions."  Ex. A at 12:24-30.   Given that a "group of systems" is not a single device, the disclosure in the specification that the Media Gateway Controller can be implemented in a soft switch made up of a group of systems is inconsistent with Defendants' proposed construction.  In another embodiment, the specification teaches that the invention's functionality can be accomplished by more than one device working together.   Ex. A at 32:5-11 (teaching an embodiment where the memory medium for the Media Gateway Controller is on a different device than the device executing the instructions in the memory medium).   Accordingly, Defendants' proposed construction is contrary to the express teaching of the specification.

> **ii.**    ***The File History Does Not Support Defendants' Construction.***

Because the '646 patent specification teaches embodiments with the Media Gateway

Controller as multiple devices, Defendants' narrow construction is appropriate only if the multiple devices embodiment was clearly an unmistakably disclaimed in the file history. *See, e.g.*, *Vitronics*, 90 F.3d at 1582; *Teleflex*, 299 F.3d at 1324; *SanDisk*, 415 F.3d at 1287. It is not. The relevant section of the file history is reproduced below:

> Rather, as described in cited paragraph [0047], in Fallentine's system, users register with an Internet directory assistance server (which operates as a peer in the network), such as a publicly available Internet Locator Service (ILS), which is then accessed by Fallentine's "Glasses" H.323 gatekeeper software over the network to retrieve the public IP addresses of the devices involved with the call, as illustrated in Figures 1, 3, 6, 7, and described throughout Fallentine. In other words, Fallentine's H.323-based gatekeeper (Glasses) operates cooperatively with a peer-to-peer service over the network that manages user (IP-telephone) registration and provides public IP addresses to the gatekeeper upon request.

> In direct contrast, in the present invention as represented in amended claim 1, a single entity, specifically, a Media Gateway Controller, performs registration, Call Setup, Media Gateway selections, and public/private IP address comparison and selection, to facilitate IP telephone calls. Note that such centrally located functionality allows local control of all these functions, whereas in Fallentine's system, peer-to-peer requests for crucial information (caller/callee public IP addresses) are made to an external entity (an Internet directory assistance service), which is quite different.

Ex. C at VOX000077-78 (December 2, 2005 Response to Office Action).

This passage explains why the invention taught in the '646 patent has novel features not taught by U.S. Patent Application No. 2002/0042832 ("Fallentine"). In particular, the inventors explained to the examiner that the functionality of the Media Gateway Controller was centralized under the control of a single "entity," as distinguished from Fallentine, which disclosed a system that relied in part on a third-party, peer-to-peer service (the ILS) to register and store public IP addresses.[13] Ex. C at VOX000077-78. The inventors make clear that they were using the word "entity" to refer to the entity controlling the device, rather than the device itself: "Note that such *centrally located functionality allows local control* of all these functions, whereas in Fallentine's system, peer-to-peer requests for crucial information…are made to an *external*

---

[13] A peer-to-peer network is one where each computer on the network will do a portion of the functionality typically reserved for centralized servers. Thus, a peer-to-peer network will by definition incorporate more than controlling entity. The key distinction made by the inventors during the prosecution of the '646 patent was that an ILS located on a peer-to-peer network lacks centralized control while the Media Gateway Controller taught by the '646 patent is centrally controlled.

*entity* (an Internet directory assistance service)…" *Id.* (emphasis added). The Internet directory assistance service described as the "external entity" was located remotely and controlled by third parties, and therefore was not under common, local control with the other functions described by Fallentine. The full context of the statement thus makes clear that the inventors did not mean to limit their invention to a "single device," but rather that the functions of the Media Gateway Controller should be "centrally located" to allow local control. In other words, in distinguishing Fallentine, the inventors made clear that these various functions had to be under the common control of a single entity (e.g., Verizon), rather than performed by multiple parties. The inventors nowhere implied, much less stated, that even within a particular organization, the various functions had to be performed by one device instead of multiple devices.

Significantly, the inventors do not refer to the Media Gateway Controller as a "single *device*" anywhere in the file history. Instead, Defendants rest their entire argument on the inventors' use of the phrase "*a single entity*, specifically, a Media Gateway Controller" (emphasis added). Defendants' argument must fail. The ordinary and customary meaning of the word "entity" supports VoxPath's construction. An entity is typically a group of somethings, like a corporation is a group of people, working toward a common purpose. Applying the ordinary understanding of the term "entity," it therefore becomes clear that the inventors used the word entity (instead of a word like "device," "box" or "piece of hardware") to emphasize that the Media Gateway Controller could be a group of systems under common control and working toward the common purpose of completing the described functionality, as taught in the specification.

Furthermore, assuming arguendo Defendants' interpretation of the inventors' statements is reasonable, the very fact that the "single entity" phrase could have more than one meaning illustrates that the phrase is too ambiguous to be a disclaimer. An ambiguous statement that is susceptible to more than one meaning does not meet the elevated standard required to disclaim patent subject matter. *SanDisk*, 415 F.3d at 1287 ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of

which is consistent with a proffered meaning of the disputed term."); *see also Omega Eng'g*, 334 F.3d at 1325-26. Thus, for this reason alone, Defendants attempt to limit Media Gateway Controller to a "single device" must be rejected.

Accordingly, Defendants' "single device" limitation is inconsistent with the file history and should be rejected.

> **b.     Adding "Handles Interactions With Separate Gateways" To The Construction Of Media Gateway Controller Is Merely Improperly Importing A Limitation From An Embodiment And Is Vague.**

The second difference between the proposed constructions is Defendants' argument that the limitation "handles interactions with separate gateways" should be included in the construction of Media Gateway Controller. Defendants' construction should be rejected because it is a textbook case of importing a limitation from the embodiments described in the specification. *See, e.g.*, *Phillips*, 415 F.3d at 1319-20 ("one of the cardinal sins of patent law [is] reading a limitation from the written description into the claims."); *Playtex*, 400 F.3d at 907 ("By its reliance on the figures, the district court improperly limited claim 1 to a preferred embodiment. We have consistently advised against this approach to claim construction."). Such limitations may only be imported to the claims if the specification expressly says so. *See, e.g.*, *Playtex*, 400 F.3d at 908.

Defendants' proposed construction appears to rely on the following passage:

> ***In one embodiment***, the "soft switch" is actually a group of systems running many applications to perform a variety of functions. For example, the part of the soft switch that handles the interaction between the IP telephones 120 and the soft switch is referred to herein as the Media Gateway Controller (MGC) 150 (from the term used in the MEGACO standard for that interaction).

Ex. A at 12:24-29 (emphasis added). By its own terms, however, this statement is a description of merely one of the embodiments of the invention taught in the '646 patent. Furthermore, the specification repeatedly emphasizes that the specification describes certain, not all, embodiments of the invention. *See* Ex. A at 6:14-15 (the title of the section where the statement above can be found is "DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT"); Ex. A at 32:28-33 (noting that the specification should not be limiting and does not describe all possible

embodiments). Since there is no disclaimer in the intrinsic evidence that expressly limits the invention to the disclosed embodiments, it would be improper to include this limitation in the construction of Media Gateway Controller.

Defendants' proposed construction is also vague and would offer no aid to the jury in understanding the claim term. Defendants proposed construction only begs further questions, such as: What "interactions" are Defendants' referring to? What does it mean to "handle" the interactions? Defendants' proposed construction fails to answer these questions.

For these reasons, Defendants' proposed limitation should be rejected.

### c. Defendants' "Address Selection" Limitation Misquotes The File History, Is Vague, Confusing, And Contrary To The Claim Language

The third difference in Defendants' proposed construction is the limitation that the Media Gateway Controller must engage in "public/private IP address comparison**, and address** selection." In VoxPath's proposed construction, the tasks listed after "performs" are a direct quote from the file history and are therefore fully supported by the intrinsic evidence. Ex. C at VOX000078. Defendants' proposed construction, on the other hand, alters the actual quote from the file history by adding the word "address" before selection and a comma before the conjunction "and," grammatically separating "address selection" from the "public/private IP address comparison" clause.

| Actual File History[14] | Defendants' Proposed Construction |
|---|---|
| "and public/private IP address comparison and selection" | "and public/private IP address comparison, and address selection" |

These changes alter the meaning of the quote and make it inconsistent with the clear language of the claims. Under Defendants' altered meaning, the Media Gateway Controller must compare public/private IP addresses. This is contrary to the claims. The claims require 1) comparison of the ***public*** IP addresses of the Media Gateways; and 2) selection of ***either the public or private*** IP addresses of the Media Gateways. Ex. A

---

[14] Ex. C at VOX000078.

at Claim 1.  The claims do not require comparison of private IP addresses.  Defendants'

construction should be rejected because it is clearly contrary to the file history, and more

importantly, the claims.[15]  Accordingly, Defendants' misguided proposed construction

should be rejected in favor of VoxPath's proposed construction.

**B.**    **"Registering a First Media Gateway with a Media Gateway Controller, Wherein Said Registering the First Media Gateway Comprises Receiving and Storing the Public IP Address of the First Media Gateway":  No Construction Necessary Or "Receiving And Storing The Public IP Address Of A Media Gateway."**

| Term | VoxPath's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| registering a first Media Gateway with a Media Gateway Controller, wherein said registering the first Media Gateway comprises receiving and storing the public IP address of the first Media Gateway | No construction is necessary.<br><br>If a construction is necessary, VoxPath proposes:  "receiving and storing the public IP address of a Media Gateway." | a process during which a Media Gateway provides to a Media Gateway Controller its associated public IP address and is stored for later retrieval |

**1.**    ***No Construction Is Necessary Because The Claim Defines The Term.***

This claim phrase can be simplified greatly for construction purposes to just the phrase

"registering."[16]  The claim terms Media Gateway, Media Gateway Controller and Public IP

Address are already construed terms and do not need additional construction.  The words "store"

and "receiving" are also clear as written in the claims and Defendants even use the word "store"

in their proposed construction.   The articles and connectors, of course, do not require

construction.  Therefore, the Court is left with the task of determining the proper construction of

the term "registering."

The term "registering" is self-defining within the claims themselves and therefore does

---

[15] VoxPath's construction uses the quote from the file history.  However, if the Court wanted to eliminate any ambiguity, it could use the language, "public IP address comparison, and public/private IP address selection."  This language is clearer and would also be consistent with the claims.

[16] The construction of this phrase should be consistent for all uses of "registering." In addition to the claims where the whole phrase is found, the term registering can be found in claims 4, 5, 10, 11, 16 and 17.

not need a construction. As the claim language itself says, "registering…comprises receiving and storing the public IP address of the first Media Gateway." Ex. A at Claim 1. The words of the claims define the invention and, where a claim term is self-defining, there should be no need to create an alternative construction that might change the construction offered by the claim language itself. If the Court believes that a construction is necessary, it should adopt the construction provided by the claim term itself: "receiving and storing the public IP address of a Media Gateway." This construction is not only fully consistent with the claim language itself but is also consistent with the description of the "registering" in the specification. *See, e.g.*, *id.* at 22:24-32.

### 2.     *Defendants' Construction Is Grammatically Flawed And Improperly Imports Limitations From The Specification.*

Defendants propose to ignore the claim language with their own construction of the claim term "registering": "a process during which a Media Gateway provides to a Media Gateway Controller its associated public IP address and is stored for later retrieval." Defendants' proposed claim construction should be rejected without even addressing the merits of the flawed construction because the construction is grammatically confusing and inaccurate on its face. It is unclear what "and is stored for later retrieval" refers to. The most literal reading of the proposed construction requires that the Media Gateway, which is a physical device, be stored by the Media Gateway Controller for later retrieval. This has no basis in the intrinsic evidence, and is nonsensical. The invention taught in the '646 patent has nothing to do with physically storing Media Gateways, and no such limitation should be read into the claim.

Even assuming that Defendants meant their construction to define registering as storing the public IP address for later retrieval—which is by no means apparent from their proposed construction—Defendants' proposed construction should still be rejected because it improperly imports two claim limitations from outside the language of the claims that are only designed to support Defendants' non-infringement position. *See Phillips*, 415 F.3d at 1319-20; *Playtex*, 400 F.3d at 907.

First, Defendants' proposed construction introduces the limitation that the Media Gateway must know its public IP address and provide that address to the Media Gateway Controller. This limitation is directly contradicted by the specification. For example, in the embodiment where the Media Gateway is on a private network behind a NAT gateway, the Media Gateway may only be aware of its private IP address. *See* Ex. A at 21:28-33 ("An example packet header is shown as part of 614, comprising a source IP address, denoted as Private"). The NAT gateway is the device that sends the public IP address of the Media Gateway to the Media Gateway Controller. *See id.* at 21:57-63 ("As indicated, the packet header information at this stage may change in the following way: the source IP address may be changed from Private to Public"); 22:24-32 ("One example of stored information is shown as part of 660, comprising the IP telephone IP address, denoted as SG Public, referring to the Service Gateway's public IP address for the telephone 120"). Sending the public IP address of the Media Gateway to the Media Gateway Controller is a claim element (*id.* at Claims 1, 7 and 13) and Defendants' proposed limitation would severely curtail the scope of the claim. Since Defendants have failed to point to any express and clear disclaimer of this subject matter in the intrinsic evidence, Defendants' proposed limitation has no basis in the intrinsic evidence and must be rejected. *See, e.g.*, *Vitronics*, 90 F.3d at 1582; *Teleflex*, 299 F.3d at 1324; *SanDisk*, 415 F.3d at 1287.

The second improper limitation in Defendants' proposed construction is that the public IP address received by the Media Gateway Controller must be stored "for later retrieval." Defendants have improperly imported this limitation from the descriptions of specific embodiments in the specification that include similar language. *See, e.g.*, Ex. A at 17:60-63 ("It should be noted that *in one embodiment*, the MGC 150 may store the received registration information for use in Call Setup, described below." (emphasis added)); 31:30-35 ("*For example, in one embodiment*, a Media Gateway may register with Media Gateway Controller 150, by sending the Media Gateway's public IP address. The public IP address may be received and stored (e.g., by the Media Gateway Controller 150) for later reference in the Call Setup

process." (emphasis added)).  It is black letter law that limitations of specific embodiments should not be read into the claim language unless there is an express and clear intention by the inventor to do so.  *See, e.g.*, *Playtex*, 400 F.3d at 908; *Rexnord*, 274 F.3d at 1344-45.  Since the inventors chose to self-define the term registering, it is clear that they did not have the express and clear intention to bring limitations from the embodiment into the claims.  Defendants' proposed construction must be rejected.

C.   **"Source IP Address" Means:  "The Public Or Private IP Address Of The Media Gateway Sending The Call Setup Request To The Media Gateway Controller."**

| Term | VoxPath's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| source IP address | the public or private IP address of the Media Gateway sending the Call Setup request to the Media Gateway Controller | the IP address of the Media Gateway sending the Call Setup request to the Media Gateway Controller |

VoxPath proposes that the claim term Source IP Address[17] be construed as:  "the **public or private** IP address of the Media Gateway sending the Call Setup request to the Media Gateway Controller."  The parties agree on the construction of this term, except that Defendants do not believe that the language in bold is necessary.

As discussed above, a device can have a public IP address and, if it is located behind a NAT gateway, a private network address.  During the meet and confer process, Defendants agreed that a Source IP Address can be either the Media Gateway's public IP address or its private IP address.  The language proposed by VoxPath is necessary, therefore, for clarity.  Although Defendants acknowledged during the meet and confer that a Source IP Address can be either the public or private IP address for the Media Gateway, they are content to leave the type of "IP address" vague in their proposed construction.  VoxPath's construction, on the other hand, addresses this ambiguity and is consistent with the way the term is used in the specification.  *See,*

---

[17] Source IP Address can be found in claims 1, 7 and 13.

*e.g.*, Ex. A at Figs. 6A-6C (showing the source IP of the packet header changing from private to public); 4:4-17 (describing a private Source IP address and a public Source IP address).

An ambiguous claim construction will only lead to further disputes in the future. For example, if Defendants' ambiguous claim construction is adopted, one party may later assert that Defendants' construction was always meant to apply to public IP addresses, not private. Defendants all but admitted this possibility during the meet and confer. This dispute would likely have to be presented to the Court and would effectively be a second round of claim construction. This is not efficient and essentially vitiates the whole purpose of claim construction (to clarify the meaning of the claim terms). Therefore, the Court should adopt VoxPath's proposed construction.

**D.     "Memory Medium" Means: "Memory."**

| Term | VoxPath's Proposed Construction | Defendants' Proposed Construction |
|------|-------------------------------|----------------------------------|
| memory medium | memory | memory of the Media Gateway Controller |

VoxPath proposes that the term "Memory Medium"[18] should be construed as "memory." Defendants propose the construction "memory of the Media Gateway Controller." Both of the parties agree that the Memory Medium is memory. This construction is also supported by the specification. *See, e.g.*, Ex. A at 31:64-32:4. The dispute, then, is whether the term Memory Medium should be limited to the memory of a specific aspect of the invention, particularly the Media Gateway Controller. Defendants' construction is directly contradicted by the specification, which discusses multiple aspects of the invention having a Memory Medium. Ex. A at 4:34-46 (mentioning an "IP telephone memory medium," a "Service Gateway memory medium" and a "Media Gateway Controller memory medium"); *see also* Ex. A at 31:63-64 (referring to Memory Medium generally as the location where "software according to an embodiment of the present invention may be stored").

---

[18] Memory Medium can be found in claims 13 through 18.

Since the specification is not limiting, Defendants intend to rely on the file history to argue that the inventors disclaimed the broader subject matter.  However, there is no express and unmistakable disclaimer of the scope of the Memory Medium term anywhere in the file history. In fact, the only place that the Memory Medium claims (claims 15 through 21 of the patent application) are even mentioned by the inventor in the file history is to note that they have "similar" limitations to those of claim 1.  Ex. C at VOX000078; *see also* Ex. C at VOX000060-61 (the examiner's reasons for allowance also make no reference to reliance on a limitation of the scope of the Memory Medium claims).  This statement does not constitute an express and unmistakable intention to limit Memory Medium to only the memory of the Media Gateway Controller.  *See, e.g.*, *Playtex*, 400 F.3d at 908; *Rexnord*, 274 F.3d at 1344-45.  Defendants' overly limiting construction should therefore be rejected.

E.    **"The Media Gateway Controller Comparing A Public IP Address Of The First Media Gateway To A Public IP Address Of The Second Media Gateway":  No Construction Necessary.**

| Term | VoxPath's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| the Media Gateway Controller comparing a public IP address of the first Media Gateway to a public IP address of the second Media Gateway | No construction necessary. | the Media Gateway Controller comparing a public IP address of the first Media Gateway to a public IP address of the second Media Gateway to determine if the public IP addresses are the same |

This claim phrase is an entire element of claim 1 and VoxPath does not believe that any construction is necessary for this claim element.[19]  When read in the context of the claims, the ordinary meaning of the claim element is plain.  Defendants do not assert otherwise; instead, they seek to add a limitation to this claim element out of whole cloth for non-infringement purposes.  In particular, Defendants propose that this claim element be construed as "the Media Gateway Controller comparing a public IP address of the first Media Gateway to a public IP

---

[19] Similar language can also be found in claims 7 and 13.  The construction of this phrase should apply equally to the phrases in claims 7 and 13.

address of the second Media Gateway **to determine if the public IP addresses are the same**." This construction should be rejected because it is nothing more than an attempt to import a limitation into the claims, which is not permissible. *Phillips*, 415 F.3d at 1319-20 ("one of the cardinal sins of patent law [is] reading a limitation from the written description into the claims."); *Playtex*, 400 F.3d at 907.[20]    VoxPath respectfully requests that the Court reject Defendants' proposed construction and find that no construction is necessary for this phrase.

## V.    CONCLUSION.

VoxPath's proposed claim constructions accurately reflect the full scope of what the inventors claimed to have invented in the intrinsic evidence.  Claim constructions must stay true to what the inventors claimed to have invented, as described in the public record.  Defendants' efforts to unnecessarily introduce claim limitations, sometimes without any support at all, are not well taken and should not be adopted by the Court.  VoxPath respectfully requests that the Court construe the claims as proposed by VoxPath.

Dated:  April 10, 2009                        Respectfully submitted,


                                              By:   /s/ Marc A. Fenster

                                              Marc A. Fenster
                                              California Bar No. 181067
                                              Robert E. Satterthwaite
                                              California State Bar No. 223767
                                              Andrew D. Weiss
                                              California State Bar No. 232974
                                              Russ August & Kabat
                                              12424 Wilshire Blvd., Suite 1200
                                              Los Angeles, CA 90025
                                              Telephone: (310) 826-7474

---

[20] Defendants' attempt to import a limitation from the specification for non-infringement purposes is not a "fundamental dispute regarding the scope of a claim." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). As a result, there is no need for the Court to construe this term. *Id.*; *see also Alcatel USA Sourcing, Inc. v. Microsoft Corp.*, Case No. 6:06 CV 499, 2008 U.S. Dist. LEXIS 64351, at *19-22 (E.D. Tex. Aug. 21, 2008)  ("The claims provide the context such that construction of the "comparing" step is not necessary.") (attached as Exhibit D).

Facsimile: (310) 826-6991
E-mail: mfenster@raklaw.com
E-mail: rsatterthwaite@raklaw.com
E-mail: aweiss@raklaw.com

Andrew Wesley Spangler
Spangler Law PC
104 E Houston St
Suite 135
Marshall, TX 75670
Telephone: (903) 935-3443
Facsimile: (903) 938-7843
Email: spangler@spanglerlawpc.com


Patrick R. Anderson
Michigan Bar No. P68961
Patrick R. Anderson PLLC
4225 Miller Rd, Bldg. B-9
Suite 358
Flint, MI 48507
Telephone: (517) 303-4806
Facsimile: (413) 683-0614
E-mail: patrick@prapllc.com

**ATTORNEYS FOR PLAINTIFF**
**VOXPATH NETWORKS, INC.**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this 10th day of April, 2009. Any other counsel of record will be served by facsimile and first class mail.


/s/ Marc A. Fenster
Marc A. Fenster